66

**UNSEALED** 1|10|14

United States District Court
Southern District of Texas
FILED

JAN 0 8 2014

David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No.   **M-14-0067** |
| | § | |
| VICTOR LEE GONZALEZ | § | |

## SEALED INDICTMENT

**THE GRAND JURY CHARGES:**

At all times material to this Indictment:

## THE MEDICARE PROGRAM

1.     The Medicare Program ("Medicare") was a federal health care benefit program signed into law in 1965, as Title XVIII of the Social Security Act, for the purpose of providing federal funds to pay for certain specified medical benefits, items, or services (hereinafter referred to as "medical services") furnished to individuals who were over the age of 65, blind, disabled, and who were qualified and enrolled as Medicare beneficiaries.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.   Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

2.     The Medicare program consisted of multiple parts, including, Part A (Hospital Insurance), Part B (Medical Insurance), and Prescription Drug Coverage.   Part A helped cover inpatient care in hospitals, including critical access hospitals, and some skilled nursing facilities. It also helped cover hospice care and some home health care services.   Part B helped pay for certain physician services, outpatient services, medical equipment, and certain ambulance transportation services.   Part B helped pay for covered benefits when they were medically necessary and when the Medicare beneficiaries met certain conditions.

3.      Medicare assigned every person qualified and enrolled as a Medicare beneficiary a unique personal Medicare identification number known as a Health Insurance Claim Number, often referred to as a ("HICN").

4.      Medicare funds were intended to pay for medical services furnished to Medicare beneficiaries by enrolled Medicare providers and suppliers when such medical services were furnished in accordance with all of the rules regulations and laws which governed the Medicare program.   There was no significant difference between the terms "provider" and "supplier", and the term "provider" will be used herein.

5.      A person or entity that desired to become a Medicare provider was required to submit an application, and sign an agreement, which included a promise to comply with all Medicare related laws and regulations.   Medicare assigned a unique "Medicare Provider Identifier" (MPI) to each approved Medicare provider.   A person or entity with a MPI could file claims, also known as bills, with Medicare to obtain reimbursement for covered medical services which were furnished to Medicare beneficiaries in accordance with the rules, regulations, and laws pertaining to the Medicare program.   The Medicare Provider Manual, bulletins, and newsletters distributed and available to all Medicare providers, and to the public, contained the rules and regulations pertaining to Medicare-covered medical services and instructions on how to appropriately bill for medical services furnished to Medicare beneficiaries.   The Medicare rules and regulations were published in various forms and made available to all Medicare providers and to the public.

6.      CMS contracted with private contractors, typically insurance companies, to

provide certain administrative services for Medicare, such as provider enrollment, claims processing and payment. A contractor that provided administrative services under Part B of Medicare was sometimes referred to as a "carrier."

7.      In order to receive reimbursement from Medicare for medical services to beneficiaries, Medicare providers submitted, or caused the submission of claims to a Medicare carrier. Claims could have been submitted either directly by the provider, or through a billing company selected by the Medicare provider. Claims could have been submitted either in paper form or electronically. Medicare providers could only submit claims on, or after, the "date of service" to the beneficiary. Although Medicare providers may have sometimes submitted claims in groups for efficiency, every claim was considered individually.

8.      Medicare ambulance services providers were required to submit their Medicare claims on a standardized form commonly referred to as a "Form 1500", "HCF 1500", or "CMS 1500." Certain specific information was required to be on each claim form, including but not limited to the following:

     a.     the beneficiary's name and unique personal Medicare identification number (HICN);

     b.     the date of service;

     c.     the specific uniform code for the diagnosis of, or nature of, the Medicare beneficiary's illness, injury, or condition;

     d.     the specific uniform national Healthcare Common Procedure Coding System (HCPCS) code established by CMS to define and describe the ambulance services for which payment was sought;

     e.     the name and unique physician identification number ("UPIN") or national provider identifier ("NPI") of the physician who prescribed or ordered the ambulance services for which payment was sought; and

     f.     the provider's MPI number; and

g.      origin and destination codes, and all applicable modifier codes.

9.      Origin and destination codes, and modifier codes were sometimes required to provide additional information regarding the ambulance services, such as when the information provided by a HCPCS code descriptor needed to be supplemented to identify specific circumstances that applied to the ambulance services.

10.     For each claim submitted, the Medicare provider certified, among other things, that: (a) the information on the claim form was true, accurate, and complete; (b) the medical services had been provided to the Medicare beneficiary; and (c) the medical services listed on the claim were medically indicated and necessary to the health of the Medicare beneficiary.

11.     Claims to Medicare were paid either by paper check delivered by the United States Postal Service or by wire or radio transmissions, in transactions known as electronic funds transfers.

## THE MEDICAID PROGRAM

12.     The federal Medical Assistance program (commonly known as the Medicaid program), was a federal health care benefit program signed into law in 1965, as Title XIX of the Social Security Act, for the purpose of providing joint state and federal funds to pay for medical benefits items or medical services furnished to individuals of low income who were qualified and enrolled as Medicaid beneficiaries.   States desiring to participate in, and receive funding from, the federal Medicaid program were required to develop a "state plan" for medical assistance and obtain approval of the plan from the United States Department of Health and Human Services.   Upon approval of its state plan, each individual state administered its own Medicaid program, subject to the requirements of the state plan, the Social Security Act, the United States Department of Health and Human Services and all other applicable state and federal laws.

4

13.     The Texas Medical Assistance Program also known as the Texas Medicaid program (herein after referred to as "Texas Medicaid"), was implemented under the provisions of Title XIX of the federal Social Security Act and Chapter 32 of the Texas Human Resources Code, for the purpose of providing joint state and federal funds to pay for medical benefits items or medical services furnished to individuals of low income who were qualified and enrolled as Texas Medicaid beneficiaries.   Texas Medicaid was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

14.     Texas Medicaid assigned every person qualified and enrolled as a Texas Medicaid beneficiary a unique personal Texas Medicaid identification number known as a Patient Control Number ("PCN").

15.     The Texas governmental agency known as the Health and Human Services Commission ("HHSC") was the single state Medicaid agency in Texas responsible, subject to oversight by the federal government, for administering the Texas Medicaid program at the state level.   Federal funding was only available to the Texas Medicaid program as long as the Texas Medicaid program complied with the terms and requirements of the state plan, the Social Security Act, the United States Department of Health and Human Services, and all other applicable state and federal laws, and with the rules and regulations established by both the federal government and the State of Texas pertaining to Texas Medicaid.

16.     The Texas Medicaid & Healthcare Partnership (hereinafter referred to as "TMHP") was under contract with HHSC to provide certain administrative functions such as provider enrollment, claims processing and payment, and publishing the Texas Medicaid Provider Procedures Manual which contained the rules and regulations of the Texas Medicaid program established by the state plan and by HHSC.

5

17.    Texas Medicaid funds were intended to pay for covered medical services furnished to Texas Medicaid beneficiaries, by enrolled Texas Medicaid providers, when such medical services were furnished in accordance with all of the rules, regulations, and laws which governed Texas Medicaid; and for crossover claims described in paragraph 19 below, when the medical services were also furnished in accordance with all of the rules, regulations, and laws which governed Medicare.

18.    A person or entity that desired to become a Texas Medicaid provider was required to submit an application and sign an agreement which included a promise to comply with all Texas Medicaid related laws and regulations.   Texas Medicaid assigned a unique Texas Provider Identifier ("TPI") number to each approved Texas Medicaid provider.   A person or entity with a TPI number could file claims, also known as bills, with Texas Medicaid to obtain reimbursement for covered medical services which were furnished to Texas Medicaid beneficiaries in accordance with the rules, regulations, and laws pertaining to the Medicaid program; and for crossover claims described in paragraph 19 below, when the medical services were also furnished in accordance with all of the rules, regulations, and laws which governed Medicare.

19.    An individual who was a beneficiary under both Medicare and Texas Medicaid was sometimes referred to as a "dual-eligible beneficiary."   When a service provided to a dual-eligible beneficiary was a benefit of both Medicare and Texas Medicaid, the Medicare provider was required to submit claims with Medicare first.   After Medicare paid the allowed amount of the claim (usually 80 percent), the remaining balance was automatically submitted to Texas Medicaid for payment as what was generally referred to as a "crossover claim."   Texas Medicaid paid crossover claims only if Medicare had paid first, and only if the provider had followed all of the rules, regulations, and laws which governed both Medicare, and Texas Medicaid.

6

20.     Texas Medicaid would only pay reimbursement for medical services, which were medically necessary to the treatment of the beneficiary's illness, injury, or condition.

21.     To receive reimbursement from Texas Medicaid for medical services to beneficiaries, Texas Medicaid providers submitted or caused the submission of claims to Texas Medicaid, either directly or through a billing company.   Claims could be submitted either in paper form or electronically.   Texas Medicaid providers could only submit claims on or after the "date of service" to the beneficiary.   Although Texas Medicaid providers may have sometimes submitted claims in groups for efficiency, every claim was considered individually.

22.     Texas Medicaid ambulance services providers were required to submit their Texas Medicaid claims on a standardized form commonly referred to as a "Form1500", "HCF 1500", or "CMS 1500."   Certain specific information was required to be on each claim form, including but not limited to the following:

> a.     the beneficiary's name and unique personal Texas Medicaid identification number (PCN);
>
> b.     the date of service;
>
> c.     the specific uniform code for the diagnosis of, or nature of, the Texas Medicaid beneficiary's illness, injury, or condition;
>
> d.     the specific uniform national Healthcare Common Procedure Coding System (HCPCS) code established by CMS to define and describe the ambulance services for which payment was sought;
>
> e.     the name and unique physician identification number ("UPIN") or national provider identifier ("NPI") of the physician who prescribed or ordered the ambulance services for which payment was sought;
>
> f.     the provider's TPI number; and
>
> g.     origin and destination codes, and all applicable modifier codes.

23.     Origin and destination codes, and modifier codes were sometimes required to

provide additional information regarding the ambulance services, such as when the information provided by a HCPCS code descriptor needed to be supplemented to identify specific circumstances that applied to the ambulance services.

24.     For each claim submitted, the Texas Medicaid provider certified, among other things, that: (a) the information on the claim form was true, accurate, and complete; (b) the medical services had been provided to the Texas Medicaid beneficiary; and (c) the medical services listed on the claim were medically indicated and necessary to the health of the Texas Medicaid beneficiary.

25.     Claims to Texas Medicaid were paid either by paper check delivered by the United States Postal Service or by wire or radio transmissions, in transactions known as electronic funds transfers.

### MEDICARE COVERAGE FOR AMBULANCE TRANSPORTATION

26.     The Medicare benefits for ambulance transportation services were very restricted. Medicare covered ambulance transportation services only if the services were furnished to a beneficiary whose medical condition, at the time of transport, was such that transportation by other means would endanger the patient's health.   Medicare did not pay for ambulance transportation for beneficiaries whose medical condition permitted transportation in any non-ambulance vehicle. Medicare payment for ambulance transportation depended on the patient's condition at the actual time of the transport regardless of the patient's diagnosis.

27.     In the absence of an emergency condition, ambulance transportation services were only covered if the patient's doctor certified that the patient needed transportation by ambulance, and if one, or both, of the following circumstances existed: (1) the patient being transported could not have been transported by any other means from the point of origin to the destination without

endangering the patient's health, or (2) the patient was bed confined before, during and after transportation.

28.     A thorough assessment and documented description of the patient's medical condition at the time of ambulance transportation was essential for Medicare coverage for ambulance transportation.   Medicare required that an ambulance services provider's comments or statements about the patient's medical condition or bed-bound status be validated in the Medicare ambulance services provider's documentation using contemporaneous objective observations and findings.

29.     Medicare ambulance services providers were required to completely document the patient's condition at the time of the transport in order to provide justification that ambulance transportation was required.   Medicare required a description of the patient's symptoms and physical findings in sufficient detail to demonstrate that the patient's conditions were severe enough to justify payment for ambulance transportation services.

30.     Because each non-emergency ambulance transport had to be medically necessary, Medicare reimbursed ambulance providers separately for each separate leg of a round trip.

31.     In order to qualify for payment for ambulance transportation services, Medicare required that the vehicle used as an ambulance be specifically designed or equipped to respond to medical emergencies and, in non-emergency situations, be capable of transporting beneficiaries with acute medical conditions.   Medicare required that the vehicle comply with state and local laws governing the licensing and certification of an emergency transportation vehicle.   At a minimum, each ambulance was required to contain a stretcher, linens, emergency medical supplies, oxygen equipment and other lifesaving emergency medical equipment, and be equipped

9

with emergency warning lights, sirens and telecommunications equipment as required by state and local law.  Including, at a minimum, one two-way voice radio or wireless telephone.

32.   For each ambulance transport, the emergency medical technician aboard the ambulance was required to prepare a report (commonly referred to as a "run sheet") which included the patient's condition, such as blood pressure, pulse, respiration, general physical condition, and any physical complaints.  Run sheets were to document a patient's condition, the necessity for any care rendered, and the care a provider actually rendered to the patient.  Complete and accurate medical documentation in ambulance run sheets was essential for two reasons: first, it was a necessary component to proper medical care and ensured that the patient received informed care by any subsequent provider; and second, the documentation was necessary to support any claim for reimbursement submitted by the provider.

33.   A patient's ability to walk about or move from place to place, sit in a chair or wheelchair, and the patient's means of entering the ambulance were medically significant facts and should have been noted on the run sheet in order to ensure that the medical records were complete and accurate.

34.   A requirement for Medicare payment for ambulance transportation was that the needed services of the ambulance personnel were provided and that clear clinical documentation validated said need.

35.   Texas Medicaid paid cross-over claims for the ambulance transportation services provided when all of the conditions contained in paragraph 19 were met.

## MEDICAID COVERAGE FOR AMBULANCE TRANSPORTATION

36.   Texas Medicaid payment for ambulance transportation may be made only for those patients whose condition at the time of transport is such that ambulance transportation is medically

10

necessary.   For example, it is insufficient that a patient merely has a diagnosis such as pneumonia, stroke, or fracture to justify ambulance services transportation.   In each of those instances, the condition of the patient must be such that transportation by any other means is medically contraindicated.

37.   Non-emergency ambulance transport is defined as ambulance transport provided by an ambulance provider for a Texas Medicaid client to or from a scheduled medical appointment, to or from another licensed facility for treatment, or to the client's home after discharge from a hospital.

38.   Texas Medicaid does not reimburse providers for services that do not result in a transport to a facility, regardless of any medical care rendered.   If a patient contacts an ambulance service provider, but the call does not result in a transport, the provider should have the patient sign an acknowledgment statement and may bill the patient for the services rendered.

39.   An ambulance services provider is required to maintain documentation that represents the patient's medical condition(s) and other clinical information to substantiate medical necessity and the level of service and mode of transportation requested.

## VICTORY EMS AND THE DEFENDANTS

40.   Defendant VICTOR LEE GONZALEZ, was a resident of Hidalgo County, Texas and was the owner and operator of Vic's Texas Transport Inc., dba Victory EMS (hereinafter referred to as Victory EMS).

41.   On or about October 1, 2009, defendant VICTOR LEE GONZALEZ, on behalf of Victory EMS, became enrolled as an ambulance service provider in the Medicare program. Medicare Provider Identifier (MPI) #AMB901 was assigned to Victory EMS.

42. On or about January 21, 2010, defendant VICTOR LEE GONZALEZ, on behalf of Victory EMS, applied to be an ambulance service provider in the Texas Medicaid program. Texas Provider Identifier (TPI) #2155681was assigned to Victory EMS. National Provider Identifier (NPI) #1063745685 was assigned to Victory EMS.

43. Victory EMS ostensibly provided ambulance services to Medicare and Texas Medicaid beneficiaries (hereinafter referred to as beneficiaries) in Hidalgo County.

## MEDICARE AND TEXAS MEDICAID BILLINGS AND PAYMENTS

44. From on or about January 1, 2010 through February 28, 2013, defendant VICTOR LEE GONZALEZ submitted or caused others to submit approximately 621 false and fraudulent claims in the approximate aggregate sum of $545,054.00 to Medicare and Texas Medicaid, for ambulance transportation services which were not provided to Medicare and Texas Medicaid beneficiaries. As a result of said false and fraudulent claims, Medicare and Texas Medicaid, paid the approximate aggregate sum of $339,730.26.

## SCHEME TO DEFRAUD

45. In order to execute and carry out his illegal activities, defendant VICTOR LEE GONZALEZ committed the following acts:

(a) Defendant submitted or caused others to submit claims with Medicare and Texas Medicaid for reimbursement of ambulance transportation services that were not provided, such as billing for transporting beneficiaries to and from therapy and dialysis clinics on dates when the beneficiaries did not receive therapy or dialysis or go to those clinics. Therapy and dialysis clinic records show that the beneficiaries did not receive therapy and dialysis for the dates of service that the defendant billed Medicare and Texas Medicaid. The defendant filed or caused others to file the claims with Medicare and Texas Medicaid knowing that said claims were false and fraudulent since ambulance transportation of beneficiaries was not provided.

(b) Defendant billed or caused others to bill Medicare and Texas Medicaid for

ambulance transportation services on dates when the beneficiaries cancelled appointments, did not show for appointments, and/or otherwise did not receive therapy or dialysis.   The defendant billed or caused others to bill for ambulance transportation services on dates when the beneficiary was out of the state and could not have been transported to the therapy clinic.   Records show the beneficiary did not receive therapy on those dates.

The defendant billed or caused others to bill Medicare and Texas Medicaid for round-trip ambulance transports of a beneficiary from a nursing home facility to a dialysis clinic on dates after the beneficiary had moved out of the county and no longer received dialysis at said clinic.   Records show that the beneficiary did not receive dialysis at said clinic and that the beneficiary did not reside at the nursing home on those dates.

The defendant billed or caused others to bill for ambulance transportation services to and from a conference in Houston, Texas when the beneficiary had been transported by her sister and with her mother in a private vehicle.

(c)     Defendant created falsified run sheets which were intended and calculated to make the fraudulent claims submitted to Texas Medicaid appear legitimate.   Defendant falsified and altered the required run sheets by entering dates on said run sheets for dates of ambulance transportation services when no ambulance transportation had been provided as claimed in his billings to Texas Medicaid.   Defendant photocopied information from a previous run of a beneficiary in an attempt to make it appear that he had properly documented subsequent runs involving that beneficiary.

(d)     During and in relation to his fraudulent conduct and to further his scheme and artifice to defraud Texas Medicaid, the defendant knowingly used the United States Postal Service to execute his scheme and artifice to commit health care fraud by submitting and mailing false and fraudulent claims to Texas Medicaid.

(e)     During and in relation to his fraudulent conduct and to further his scheme and artifice to defraud Texas Medicaid, the defendant knowingly transferred, possessed, or used or knowingly caused others to transfer, possess, or use, without lawful authority, one of more means of identification of Texas Medicaid beneficiaries which he used to execute his scheme and artifice to commit health care fraud.

## COUNTS ONE THROUGH FIVE
## HEALTH CARE FRAUD

46.     The Grand Jury incorporates by reference paragraphs 1 through 45 as though fully restated and re-alleged herein.

47.     Beginning on or about January 1, 2010 through February 28, 2013, in the McAllen Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the exact dates being unknown to the Grand Jury, defendant,

### VICTOR LEE GONZALEZ

did knowingly and willfully execute or attempt to execute a scheme or artifice to defraud the health care benefit programs known as Medicare and Texas Medicaid, or to obtain by false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of the health care benefit programs known as Medicare and Texas Medicaid, in connection with the delivery of, or payment for, health care benefits, items, or services. Defendant submitted, aided, abetted, counseled, commanded, induced, procured or otherwise facilitated or caused each other and others to submit false and fraudulent claims to Medicare and Texas Medicaid, for medical benefits, items, and services which were not provided, including, but not limited to the following:

| Count | Patient | Last 5 Digits of Patient Medicare and Medicaid Numbers | Date of Alleged Service (On or about) | Date Billed (On or about) | Amount Billed | Reason Claim Was False and Fraudulent |
|-------|---------|--------------------------------------------------------|----------------------------------------|---------------------------|---------------|----------------------------------------|
| 1 | O.O. | Medicare 86308T Medicaid 90335 | 8/30/2010 | 3/1/2011 3/15/2011 | $785.00 | No ambulance transportation was provided. Patient resided in another county and did not receive dialysis at clinic as billed. |

| Count | Patient | Last 5 Digits of Patient Medicare and Medicaid Numbers | Date of Alleged Service (On or about) | Date Billed (On or about) | Amount Billed | Reason Claim Was False and Fraudulent |
|---|---|---|---|---|---|---|
| 2 | N.R. | Medicaid 56517 | 8/16/2012 | 8/18/2012 | $930.00 | No ambulance transportation was provided. Patient did not receive therapy. |
| 3 | C.S. | Medicaid 76104 | 9/15/2012 | 9/18/2012 | $7730.00 | No ambulance transportation was provided. Patient driven by family member in private vehicle to conference in Houston, TX. |
| 4 | M.T. | Medicaid 56471 | 12/26/2012 | 12/28/2012 | $930.00 | No ambulance transportation was provided. Patient did not receive therapy; patient was out of state. |
| 5 | A.R. | Medicaid 64591 | 1/11/2013 | 1/15/2013 | $670.00 | No ambulance transportation was provided. Patient did not receive therapy. |

All in violation of Title 18, United States Code, Section 1347.

## COUNTS SIX THROUGH EIGHT
## AGGRAVATED IDENTITY THEFT

48.     The Grand Jury incorporates by reference paragraphs 1 through 45 as though fully restated and re-alleged herein.

49.     Beginning on or about January 1, 2010 through February 28, 2013, in the McAllen Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the exact dates being unknown to the Grand Jury, defendant,

## VICTOR LEE GONZALEZ

during and in relation to a felony violation of Chapter 63 of the United States Code, did knowingly

transfer, possess, or use, without lawful authority, a means of identification of another person,

including but not limited to the following:

| Count | Patient | Last 5 Digits of Patient Medicaid Number | Date of Alleged Service (On or about) | Date Billed (On or About) | Amount Billed | Reason Claim Was False and Fraudulent | Means of ID Used Without Lawful Authority on False and Fraudulent Claim |
|---|---|---|---|---|---|---|---|
| 6 | N.R. | Medicaid 56517 | 8/16/2012 | 8/18/2012 | $930.00 | No ambulance transportation was provided. Patient did not receive therapy. | Patient's Medicaid Number |
| 7 | C.S. | Medicaid 76104 | 9/15/2012 | 9/18/2012 | $7730.00 | No ambulance transportation was provided. Patient driven by family member in private vehicle. | Patient's Medicaid Number |
| 8 | M.T. | Medicaid 56471 | 12/26/2012 | 12/28/2012 | $930.00 | No ambulance transportation was provided. Patient did not receive therapy. | Patient's Medicaid Number |

All in violation of Title 18, United States Codes, Section 1028A.

## COUNT NINE
## MAIL FRAUD

50.    The Grand Jury incorporates by reference paragraphs 1 through 45 as though fully

restated and re-alleged herein.

51.    Beginning on or about January 1, 2010 through February 28, 2013, in the McAllen

Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the

exact dates being unknown to the Grand Jury, defendant,

### VICTOR LEE GONZALEZ

having devised and having intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing a such scheme or artifice to obtain payment for ambulance transportation services which were not provided, did place in any post office or authorized depository for mail, documents supporting the submission of false and fraudulent claims, including, but not limited to the following:

| Count | Patient | Last 5 Digits of Patient Medicare and Medicaid Numbers | Date of Alleged Service (On or about) | Date Billed (On or about) | Reason Claim was False and Fraudulent |
|-------|---------|-----------------------------------------------------|----------------------------------------|----------------------------|----------------------------------------|
| 9 | O.O. | Medicare 86308T Medicaid 90335 | 8/30/2010 | 3/1/2011 3/15/2011 | No ambulance transportation was provided. Patient resided in another county and did not receive dialysis at clinic as billed. |

All in violation of Title 18, United States Codes, Sections 1341.

A TRUE BILL

_____

FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

_____

MICHAEL E. DAY
SPECIAL ASSISTANT UNITED STATES ATTOREY